JUSTICE WHEAT,
concurring in part and dissenting in part.
¶89 I concur with the Court’s resolution of Issues 1, 2, and 3, but I dissent on Issue 4, because, under the facts of this case, the questions of concealment, misrepresentation, and reasonable diligence, in the *536 context of the “discovery rule,” are questions of fact to be decided by the jury, not the court.
¶90 ARCO has been actively engaged in the forced clean-up of contamination in and around the Butte-Anaconda area, including Opportunity, for decades. Through that process ARCO has developed reams of information related to the extent and location of the contaminants. Such involvement has placed ARCO in a position to decide what information it should disseminate to the public. There is no dispute that ARCO disseminated plenty of information to the public, through various mediums, which was sometimes general in nature and sometimes specific to the Appellants in this case. The question dispositive to ARCO’s defense is whether this information was sufficiently self-concealing, or presented in such a way to persuade the Appellants that they had nothing to fear or had not been injured. The answer to this question is fact intensive and should be decided by the jury. It is not the Court’s job to sort through the disputed facts and interpret them one way or the other — that is the jury’s responsibility. Therefore, I would reverse the District Court’s decision that “the running of the statutes of limitations on the Plaintiffs’ claims is not tolled by Section 27-2-102(3).”
¶91 As the Court notes:
The fact that a party does not know that he or she has a claim, whether because he or she is unaware of the facts or unaware of his or her legal rights, is usually not sufficient to delay the beginning of the limitations period. The discovery rule constitutes an exception to this general principle, stating that if the facts constituting the claim are concealed or self-concealing in nature, or if the defendant has acted to prevent the injured party from discovering those facts, the period of limitations does not begin to run until the injured party has discovered, or in the exercise of due diligence should have discovered, both the injury and its cause.
Opinion, ¶ 62 (citations omitted). Under the discovery rule, the claim accrues when the plaintiff is given notice or information that would prompt a reasonable person to conduct further inquiry. Mobley v. Hall, 202 Mont. 227, 233, 657 P.2d 604, 607 (1983) (construing § 27-2-203, MCA).
¶92 Appellants argue the discovery rule should be applied for two reasons: first, because their claims are self-concealing in nature; and second, because ARCO represented that the community of Opportunity was “clean,” thereby discouraging Appellants from conducting further inquiry. The Opportunity Citizens filed their claims on April 17,2008. *537 The Court notes that the statute of limitations applicable to its analysis is three years. Opinion, ¶ 14. Thus, to prevail on its defense, ARCO must prove the Opportunity Citizens knew, or should have known, of the facts constituting their claims before April 17, 2005. Whether any of the Opportunity Citizens should have known of the facts constituting their claims earlier is a highly factual inquiry inappropriate for summary judgment in this case.
¶93 Under Montana law, knowledge of a self-concealing injury, sufficient to trigger the statute of limitations, requires knowledge of both the ipjury and its cause. Hando v. PPG Indus., Inc., 236 Mont. 493, 501, 771 P.2d 956, 961-62 (1989). ARCO inundated the District Court with thousands of pages of exhibits, to prove that most of the Opportunity Citizens were aware the Anaconda Company smelted copper in Anaconda, Montana, and were further aware the operation resulted in some environmental damage in the area. However, ARCO failed to demonstrate that the Opportunity Citizens knew, or should have known, their properties were contaminated by arsenic and other pollutants.
¶94 In fact, many of the exhibits offered by ARCO were confusing and misleading to the reader. For example, the full page ads in the Anaconda Leader that Appellants claim ARCO took out to provide citizens with “information describing potential health risks, precautions to mitigate those potential risks and answers to frequently asked questions” contained somewhat ambiguous language. In at least one of these ads, it stated:
Q 8: What happens if analysis determines my property exceeds the average arsenic concentration level of250 ppm?
A: First, don’t be alarmed; this is information that will help you. You will be informed that more extensive sampling is necessary for your property. If some cleanup is required, Atlantic Richfield Company and EPA, along with yourself will agree on the appropriate cleanup plan for your property. ...
Q 9: What will I have to show for my cooperation and participation in these activities?
A: You will learn that your property does not pose health risks to you, your children, or future owners or renters.
¶95 Additionally, the Court identifies letters dated in 2006 and 2007 that ARCO sent to many of the Appellants after conducting soil testing. It claims that these letters indicate that Appellants knew their properties were contaminated with arsenic. Opinion, ¶ 76.1 do not agree. The letters were also potentially misleadingregardingthe safety and contamination of Appellants’ properties. For example, many of *538 them included:
Although remedial action activities are still ongoing ... Atlantic Richfield Company and EPA would like to provide you the preliminary results from the sampling at this time.
The weighted average arsenic concentrations for soil samples collected from your property are attached to this letter. Your results are below the EPA set standard residential arsenic action level of 250 parts per million; therefore further sampling or remediation is not required in your residential yard.
¶96 The Court also points to several Appellants’ deposition statements that they recalled reading news articles about Environmental Investigation and Cleanup in the area surrounding their properties before April 17, 2005. However, ARCO only identified seven such Appellants. As there are over 90 Appellants, it is unclear whether all of the Appellants were aware of any news about environmental cleanup or concern in the area.
¶97 In nearly all of ARCO’s depositions of Appellants, ARCO asked (in slightly varying language) whether the Appellants could recall any misrepresentations that ARCO had made about the contamination. Many of the responses suggested that in some way ARCO did in fact misrepresent to the citizens of Opportunity regarding the quality of their property. In fact, in one public meeting, ARCO’s Sandra Stash stated, “I think the real good news out of this whole thing is that this community is not at risk,” and “95 percent of the community ... does not need to worry about [arsenic concentrations in residential soils].” Also, in ARCO’s post-testing letters to Plaintiffs dating back as far as 2000, ARCO told Plaintiffs with properties testing below 250 ppm that “[y]our results are below the EPA set standard residential arsenic action level of 250 parts per million; therefore further sampling or remediation is not required in your residential yard.”
¶98 The Opportunity Citizens’ claims are all based on damage to their properties, caused by the spread of contaminates from ARCO’s operations. Knowledge of the facts constituting the claims would necessarily include knowledge that contaminates from ARCO’s operations harmed each Opportunity Citizen’s individual property. With respect to the individual Opportunity Citizens, ARCO cited no evidence at all to suggest they know, or had any means of knowing, whether contamination existed on their individual properties. Most of the Opportunity Citizens also confirmed their lack of understanding of the impact to their property in their depositions. While some Opportunity Citizens testified they “suspected” ARCO’s activity may have harmed their properties, they had no means of discovering just *539 how bad things were.
¶99 When evaluating the highly individual and factually intense question of when the Opportunity Citizens should have learned their property was contaminated, the court and jury should consider the complexities of environmental investigation. Ultimately, the trier of fact should decide, based on all of the evidence, when the Opportunity Citizens possessed sufficient knowledge of ARCO’s invisible and toxic contamination on their properties.
JUSTICE SHEA and DISTRICT JUDGE MANLEY join in the concurring and dissenting Opinion of JUSTICE WHEAT.